# DISTRICT COURT FOR THE UNITED STATES OF AMERICA
# DISTRICT OF COLUMBIA [Washington, D.C.]

## ARTICLE III

**Makurija Sakatu**
**Maipuri Arauan Nation**
**C/O 2001 S. Michigan Ave #28M, Chicago**
**848 318 7291 / 340 513 5300**
**makurija.sakatu@icloud.com**
**PLAINTIFF,**

    V.

VIRGIN ISLANDS OF THE UNITED STATES
2122 Kongens Gade; St Thomas, USVI 00802

CONNAL RIVIERA ALFRED
FIRST BANK
9100 Havensight Suite 5; St Thomas USVI 00802

DENISE GEORGE, former USVI Attorney General,
U.S. VIRGIN ISLANDS DEPARTMENT OF JUSTICE
3438 Krondprindsens Gade GERS Bldg, 2nd Flr; St. Thomas, USVI 00802

TAMARA CHARLES
Alexander A. Farrelly Justice Center
5400 Veterans Drive, Suite 1; St Thomas, USVI 00802

SEGRID TEJO
Alexander A. Farrelly Justice Center
5400 Veterans Drive, Suite 1; St Thomas, USVI 00802

CAMITA DOWE
USVI BUREAU of MOTOR VEHICLES
4605 Tutu Park Mall Suite 231; St Thomas, USVI 00802-1736

TAMIA FREEMAN, USVI POLICE OFFICER
45 Mars Hill; Frederiksted USVI 00840

YORDANA LO BLACK, USVI POLICE OFFICER
45 Mars Hill; Frederiksted USVI 00840

DENEISHA WALTERS, USVI POLICE OFFICER
45 Mars Hill; Frederiksted USVI 00840

MELANIE HARRIGAN, USVI POLICE COMMANDER
45 Mars Hill; Frederiksted USVI 00840

RAY A MARTINEZ, USVI POLICE COMMISSIONER

Case: 1:23−cv−01601
Assigned To : Nichols, Carl J.
Assign. Date : 6/5/2023
Description: Pro Se Gen. Civ. (F-DECK)

RECEIVED

JUN - 5 2023

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

52    45 Mars Hill; Frederiksted USVI 00840
53
54    UNITED STATES VIRGIN ISLANDS POLICE DEPARTMENT
55    45 Mars Hill; Frederiksted USVI 00840
56
57    A. CANTON
58    LT GOVENORS OFFICE
59    5049 Kongens Gade; St. Thomas,Virgin Islands 00802
60
61    ALBERT BRYAN, Governor, U.S. Virgin Islands
62    2122 Kongens Gade; St Thomas, USVI 00802
63
64    U.S. SECRETARY OF INTERIOR, DEB HAALAND
65    UNITED STATES DEPARTMENT OF INTERIOR
66    1849 C Street, N.W.; Washington DC 20240
67
68    UNITED STATES DEPARTMENT OF INTERIOR
69    1849 C Street, N.W.; Washington DC 20240
70
71    U.S.A., U.S. ET AL,
72    Individually, and as representatives of a defendant class
73    composed of all persons and entities et al.
74               Defendants.
75
76
77                      **VERIFIED COMPLAINT**
78
79                    **I. Nature of the Action**
80
81    Comes now, PLAINTIFF, Makurija Sakatu of the Maipuri Arauan Nation, (the "Plaintiff") bring
82    this Alien Tort Statute claim to resolve issues of environmental racism, forced identity, official
83    oppression, and denial of rights in violation of the United Nations International Covenant
84    Convention on Civil and Political rights, PLAINTIFF is an indigenous inhabitant of United States
85    Virgin Islands territory, whose ancestors maintained natural inhabitancy prior to an illegal purchase
86    and occupation of the territory by the United States of America, and at all times relevant to these
87    matters, PLAINTIFF has been recognized as a citizen of the indigenous Arawak tribal communities
88    of the Virgin Islands and the Caribbean.
89
90    PLAINTIFF has sought redress from all DEFENDANTS and no response was provided from either
91    DEFENDANT. PLAINTIFF sent all communications via Certified U.S. mail and certified return
92    receipts are provided in EXHIBIT A., *Notarized Original Copy of* "*Notice of Intent to Sue*" is found
93    in EXHIBIT B.

94
95  PLAINTIFF seeks remedy and makes claim for Violations of Environmental Racism and Violations
96  of Human Rights, specifically, Plaintiff claims against Defendants, Et Al for damage and
97  destruction of safe and productive existence, Constructive Fraud, Identity Theft, Unlawful
98  Conversion, Economic Deception and Ethnic Cleansing, slavery i.e., unlawful possession of human
99  beings to be used as human capital, as described in US President Bill Clinton' Executive Order
100  13037, for Violations of United Nations International Covenant Convention on Political and Civil
101  Rights, Article 1 1,3, Article 2 1, 3a, Article 3, Article 5 1,2, Article 6 1,3, Article 9 1,2,5, Article
102  10 1, Article 12 2, Article 14 1, 3, Article 15, Article 26, and 42 USC §1983, Conspiracy to deprive
103  rights (under §1983 and common law) Violation of Civil Rights Act., Negligence, Intentional and
104  Negligent Infliction of Emotional Distress and injury.
105
106  In 2015 PLAINTIFF became a beneficiary of identity claims filed with the United States
107  Commerce Department and the U.S. Census Bureau, and in 2020, a United States registered
108  Constructive Notice was filed by PLAINTIFF and received by DEFENDANT BRYAN; the
109  Notice filed clearly identified PLAINTIFF as an American Aborigine of Arawak ancestry.
110
111  PLAINTIFF declares that in 2020, DEFENDANT BRYAN, whose authority is given via the
112  U.S. Virgin Islands Organic Act (Constitution) which was authorized and co-created by the
113  United States Congress, and in DEFENDANT BRYAN' capacity as Governor, DEFENDANT
114  BRYAN is an Oath sworn U.S. Constitutionally governed citizen of the United States, and in
115  this capacity PLAINTIFF declares DEFENDANT BRYAN initiated a process of Official
116  Oppression by instructing DEFENDANT CANTON to issue government-wide order to reject
117  all notices and filings submitted by indigenous inhabitants of the U.S. Virgin Islands territories.
118
119  PLAINTIFF states that the refusal of DEFENDANT BRYAN and numerous agencies under
120  his control to allow indigenous inhabitants to engage in activities that all other citizen enjoy
121  are acts of identity discrimination and apartheid against PLAINTIFF, which is evidenced by
122  numerous indigenous people of the Virgin Islands community being forced to file their notices
123  and complaints in the District of Columbia and other states occupying the U.S. mainland.
124

125    PLAINTIFF states DEFENDANT BRYAN had a duty to provide notice to agencies under his
126    command as to the identity and rights of all indigenous inhabitants including PLAINTIFF's
127    rights, which were conspired against by DEFENDANT BYRAN and DEFENDANTS ET AL.
128

129    PLAINTIFF declares that when the United States of America took control of the Virgin Islands,
130    like Denmark before them, they gave no consideration for the indigenous inhabitants and by
131    some unknown process, PLAINTIFF and other indigenous inhabitants have become forced
132    citizens, property, enslaved under doctrines of systemic apartheid and official oppression,
133    employed by DEFENDANTS ET AL.
134

135    PLAINTIFF states, the lands and indigenous people of the U.S. Virgin Islands have been
136    purchased by DEFENDANT VIRGIN ISLANDS OF THE UNITED STATES (DEFENDANT
137    VIUS), reclassified, and made commercial and real property of DEFENDANT VIUS, enslaved
138    without natural rights and these abuses and crimes against PLAINTIFF is sufficient cause to
139    bring this Alien Tort Statute claim.
140

141    Under the Alien Tort Claims Statute, Jus Cogens and Law of Nations, Customary International
142    Law of Human Rights, Foreign Relations Law Section 702, PLAINTIFF seeks full
143    acknowledgment and return of PLAINTIFF' stolen human right to identity, rights to ancestral
144    lands and rights to sustainable existence and repatriation from the genocidal, colonial grips of
145    DEFENDANT VIUS' policies, racism, murder, false imprisonment, and unrelenting
146    government oppression.
147

148    PLAINTIFF and PLAINTIFF's natural habitat has been under environmental abuse and assault
149    since the subject lands were forcefully taken by the country of Denmark as a means of self-
150    enrichment of Denmark, these same doctrines of disenfranchisement and identity destruction
151    are enshrined in the policies and governance employed by DEFENDANT VIUS ET AL  and
152    DEFENDANT DOI ET AL.
153

154    PLAINTIFF declares that DEFENDANT VIUS, with DEFENDANT DEB HAALAND
155    (DEFENDANT HAALAND) whose role as United States Secretary of the Department of
156    Interior provides governance of DEFENDANT VIUS, i.e. U.S. Virgin Islands engages incovin,

157    to racially subjugate and deliberately destroy PLAINTIFF' culture, steal PLAINTIFF' lands,
158    means of livelihood and existence, DEFENDANT HAALAND, operating through
159    DEFENDANT VIUS utilizing means of physical and paper genocide, piracy, official
160    suppression, and discrimination, through systemic environmental racism tactics to deter
161    PLAINTIFF in enjoying PLAINTIFF' human rights under the United Nations International
162    Covenant Convention.
163
164    PLAINTIFF herein will demonstrate DEFENDANT VIUS' violation of the United Nations
165    Convention on the Law of the Sea (UNCLOS) when the current day territory US Virgin Islands,
166    then called the Danish West Indies, was allegedly sold to DEFENDANT VIUS on March 31,
167    1917 from the country of Denmark for twenty-five million dollars ($25,000,000) and placed
168    under the authority and control of DEFENDANT UNITED STATES DEPARTMENT OF
169    INTERIOR (DEFENDANT DOI). PLAINTIFF states that his ancestors, along with other
170    indigenous inhabitants lived in the West Indies Virgin Islands prior to the illegal sale and
171    purchase of the islands and its now enslaved, natural inhabitant, people.
172
173    PLAINTIFF claims against DEFENDANTS ET AL for damage and destruction of safe and
174    productive existence, Constructive Fraud, Aggravated Kidnapping, Identity Theft, Unlawful
175    Conversion, Economic Deception, false imprisonment, false arrest, ethnic cleansing, slavery
176    i.e., unlawful possession of human beings to be used as human capital, as described in US
177    President Bill Clinton' Executive Order 13037 – Commission to Study Capital Budgeting,
178    March 3, 1997
179
180    PLAINTIFF contends that DEFENDANT VIUS, DEFENDANT HAALAND and
181    DEFENDANT DOI are responsible for violations of the rights of PLAINTIFF under Articles
182    I (right to life), II (right to equality before the law), III (right to religious freedom and worship),
183    VI (right to a family and to protection thereof), XVIII (right to a fair trial), XX (right to vote
184    and to participate in government) and XXIII (right to property) of the American Declaration in
185    respect of lands traditionally used and occupied by PLAINTIFF and other indigenous
186    inhabitants.
187

188    PLAINTIFF is denied the free unencumbered right to movement as defined here; Article 13 of
189    the Universal Declaration of Human Rights. The right is enshrined in Article 12 of the
190    International Covenant on Civil and Political Rights: 1. Everyone lawfully within the territory
191    of a State shall, within that territory, have the right to liberty, movement and freedom to choose
192    his residence. 2. Everyone shall be free to leave any country, including his own. 3. The above-
193    mentioned rights shall not be subject to any restrictions except those which are provided by
194    law, are necessary to protect national security, public order, public health or morals or the rights
195    and freedoms of others and are consistent with the other rights recognized in the present
196    Covenant.
197

198    PLAINTIFF has suffered and is still suffering insurmountable human rights deprivations and
199    violations, as a consequence of PLAINTIFF' decisions to defend PLAINTIFF' rights to
200    freedom, Due Process of law and malicious prosecution committed by DEFENDANTS
201    GEORGE, DEFENDANT TEJO and DEFENDANT VIUS.
202

203    PLAINTIFF' life has been placed in a state of fear and apprehension, instilled when
204    PLAINTIFF was forcefully removed from PLAINTIFF' home without a Warrant or any
205    evidence of a crime committed by PLAINTIFF, who continues to operate under oppressive
206    racists doctrines, in violation of the International Convention on the Elimination of All Forms
207    of Racial Discrimination (ICERD), United Nations Educational, Scientific and Cultural
208    Organization (UNESCO)' Declaration on Race, also *See, e.g., Maya Indigenous Cmtys. of the*
209    *Toledo District v. Belize*, Case 12.053, Inter-Am. C.H.R., Report No. 40/04, ¶ 163 (2004),
210

211    PLAINTIFF also makes the claim that the purported taking of the subject lands by the
212    Defendants as described herein was void ab initio. The CERD reinforced this holding in 2005,
213    finding that New Zealand discriminated against indigenous peoples by extinguishing the
214    possibility of establishing customary titles and failing to guarantee a right of redress for that
215    wrong; PLAINTIFF asserts Defendants claim and U.S. Congress' desire to extinguish
216    aboriginal title in the Virgin Islands territory is related to the systematic discrimination suffered
217    by the many indigenous tribes under the jurisdiction of DEFENDANT DOI today, resulting
218    from acts of environmental racism. The CERD also influenced the ruling in *Mabo v.*
219    *Queensland II*, when the high court struck down the doctrine of *terra nullius*, upon which

220  British claims to acquisition of Australia were based; the *Mabo* cases have informed a number
221  of other national high courts around the world, leading them to recognize the validity of native
222  title and adding to the level of acceptance of the prohibition of environmental racism;
223  PLAINTIFF's property and procedural rights suffer inequitably from careless non-compliant
224  actions of discriminatory interference committed by DEFENDANT VIUS, DEFENDANT
225  DOI, HAALAND, BRYAN  and DEFENDANT UNITED STATES VIRGIN ISLANDS
226  POLICE DEPARTMENT (DEFENDANT USVIPD) Defendants et al systemically.
227
228  DEFENDANTS ET AL are or at all times relevant to this Complaint, employees of
229  DEFENDANT VIUS and DEFENDANT DOI and are sued individually and collectively,
230  defined as representatives of a defendant class composed of all persons and entities (including
231  each named defendant) that are currently subject to the matters of this Complaint.
232
233  ## II. Jurisdiction
234
235  The jurisdiction of the Article III Court is invoked pursuant to Jus Cogens breach of a
236  peremptory norm of international law, See Vill. of Arlington Heights v. Metro. Hous. Dev.
237  Corp., 429 U.S. 252, 264–68 (1977). Cf. RECHTSCHAFFEN & GAUNA, supra note 75, at
238  49–53 (discussing racism as a cause of environmental justice problems) and where Petitioner
239  has protected status of the victim and is a member of a discrete and insular minority, United
240  States v. Carolene Products Co., 304 U.S. 144, 153 n.4 (1938). See also Edward J. Erler, Equal
241  Protection and Personal Rights: The Regime of the "Discrete and Insular Minority," 16 GA.
242  L. REV. 407 (1982), See, e.g., Soc. and Econ. Rights Action Ctr. for Econ. and Soc. Rights v.
243  Nigeria, Communication No. 155/96, African Commission on Human and Peoples' Rights
244  (2001), at paras. 44–48 (explaining that Nigeria has an obligation to refrain from interfering
245  with rights, to ensure that others respect rights, and to fulfill its obligations under human rights
246  regimes to protect rights and freedoms).
247
248  PLAINTIFF makes claims for relief under Jus Cogens and the Alien Tort Statute in the District
249  Court for the United States of America located in the District of Columbia, within the judicial
250  foundation of violations of international norms causing the destruction of PLAINTIFF's
251  environment and the forced assimilation and integration of PLAINTIFF along with other
252  indigenous inhabitant people into colonial societal and commercial constructs, such violations

253    against PLAINTIFF have had lasting negative influence on sustainable food, housing, land
254    rights and zoning patterns, and the colonial reshaping of race, power, and wealth dynamics,
255    have all caused and perpetuated environmental racism and to this extent, DEFENDANT DOI
256    and DEFENDANT VIUS propagation of these policies have tolerated such discriminatory
257    results, that PLAINTIFF finds no other method of redress than to go to the highest Court in
258    America, the Court of Article III, "DISTRICT COURT For The UNITED STATES Of
259    AMERICA" as defined herein and states:
260
261    UNITED   STATES   CODE   "CHAPTER   5—UNITED   STATES   CODE,   DISTRICT
262    COURTS"; ending with the paragraph below: "HISTORICAL AND REVISION NOTES." If
263    you were not aware of pages 42 and 43 of Title 28 U.S.C., or if you have trouble reading or
264    printing   out   these   pages,   you   can   also   access   Title   28   U.S.C.   by   going   to
265    http://uscode.house.gov/title_28.htm.
266
267    The District Court for the United States of America, District of Columbia [Washington, D.C.]
268    is the proper venue and PLAINTIFF has examined the statute law that created every United
269    States district court and has found only one instance where Congress appeared to ordain and
270    establish an Article III United States district court.
271
272    In 1959, the U.S. Congress created an Article III United States district court for Hawaii but
273    made no provision for Article III judges by specifically precluding the President from
274    appointing them. The Code specifically provides for territorial judges for the Hawaiian Article
275    III court. Title 28 U.S.C.—Judiciary and Judicial Procedure have been enacted into positive
276    law, so the Code shows the same kinds of courts as are found in the statutes. Chapter 5 of Title
277    28 U.S.C.—District Courts consists of Sections 81 through 144. The names of all 50 states of
278    the Union will be found from Sections 81 to 131 and in addition, in Section 88 will be found
279    the District of Columbia and in Section 119 Puerto Rico. The facts are presented supporting
280    that a non-ARTICLE III court in any state of the United States cannot exercise Article III
281    judicial power, therefore the DISTRICT COURT FOR THE UNITED STATES OF
282    AMERICA is the proper jurisdictional venue for PLAINTIFF' claims.
283

284    Plaintiff provides as an example of a fact: Title 28 U.S.C. is territorial law; this fact will be
285    supported by material found in the notes to §91. Those in federal litigation, or who are
286    contemplating that exercise, should be aware that legal justice is available only from courts
287    that have judicial power. Any litigant in any United States district court in any state of the
288    Union is warned that these courts have no Article III, Section 2 judicial power whatsoever, and
289    are legislative jurisdiction, i.e., Color of law constructs of jurisprudence. District courts and
290    district court judges of the United States have been mistaken for Article III courts and judges
291    since the Judiciary Act of 1789. The mistaken belief that a court has jurisdiction is sufficient
292    to confer it when everyone is equally mistaken; but that jurisdiction remains what it is and not
293    what it is mistaken to be.

295    No United States district court (legislative) in any state may lawfully exercise Article III court
296    power. *The lawful jurisdiction of the federal district court (Article III) or courts is limited to*
297    *those places where Congress has exclusive jurisdiction.* It is also clear that federal judges and
298    federal courts have been used in the past by the federal government to create the appearance
299    of an Article III tribunal, but the transferring of an Article III judge to a state territory, does
300    not create an Article III court or jurisdiction. The federal courts within the several states, known
301    as United States District Courts, are federal and territorial, in that, these courts implement
302    administrative law on territory exclusively under the jurisdiction of the United States of
303    America *Corporate / legislative*, and not Congress *Constitutional*. ARTICLE III is the jurisdiction for this
304    claim involving environmental racism, apartheid and international fraud giving right to
305    DEFENDANT DOI and DEFENDANT VIUS to own PLAINTIFF as property purchased from
306    Denmark.

308    PLAINTIFF has experienced open and blatant judicial abuse from the judiciary of the
309    DEFENDANT VIUS' territory, where PLAINTIFF was openly denied rights to liberty, Due
310    Process, and fair bail process under the judicial authority of DEFENDANTS SEGRID TEJO
311    and DEFENDANT GEORGE. PLAINTIFF was denied bail and copies of charges and
312    documents related to the illegal judicial orders of DEFENDANT TEJO. PLAINTIFF suffered
313    a tremendous violation throughout PLAINTIFF' case, which is now dismissed after twenty
314    months, and even as this tort is being developed, PLAINTIFF is still being denied the release
315    of property and files three weeks after the case was dismissed. PLAINTIFF is being denied

316  rights to PLAINTIFF' property by DEFENDANTS VIUS, USVIPD, U.S. VIRGIN ISLANDS
317  DEPARTMENT OF JUSTICE (DEFENDANT USVIDOJ).
318

319  PLAINTIFF claims that DEFENDANT TEJO forced him to accept legal counsel from
320  DEFENDANT ANDREW CAPDEVILLE (DEFENDANT CAPDEVILLE) even though
321  PLAINTIFF objected to the appointment of DEFENDANT CAPDEVILLE. After PLAINTIFF
322  was released on Bond, DEFENDANT CAPDEVILLE made repeated threats about revoking
323  the Bond because I publicly supported fellow members of the indigenous community, who
324  were fighting for my release from the nightmare of having every agency of DEFENDANT
325  VIUS operating in covin to deny justice and human rights.
326

327  From the very beginning of PLAINTIFF' warrantless arrest, PLAINTIFF challenged the
328  jurisdiction of the arrest, because PLAINTIFF was arrested without Warrant nor any valid
329  information that PLAINTIFF had committed a crime. PLAINTIFF states that DEFENDANT
330  CAPDEVILLE tried constantly to have PLAINTIFF denounce PLAINTIFF' indigenous
331  claims and PLAINTIFF would be released without bond, but PLAINTIFF refused those
332  requests and intimidations to denounce his identity.
333

334  PLAINTIFF continually requested an Evidentiary Hearing, but PLAINTIFF was constantly
335  threatened and intimidated by DEFENDANT CAPDEVILLE each time PLAINTIFF requested
336  assistance, which was not in line with agreeing to a plea agreement for unsubstantiated claims
337  against PLAINTIFF.
338

339  PLAINTIFF makes claim against DEFENDANT TEJO and DEFENDANT CAPDEVILLE for
340  months of torment and illegal process against PLAINTIFF which included openly ordering
341  DEFENDANT TAMARA CHARLES (DEFENDANT CHARLES), Clerk of the Court to
342  reject any filing submitted by PLAINTIFF, and PLAINTIFF was ordered by DEFENDANT
343  TEJO to not enter any government buildings in order to restrict PLAINTIFF from filing claims
344  for judicial abuse and other violations committed against PLAINTIFF by DEFENDANTS,
345  CAPDEVILLE, TEJO, VIUS ET AL.
346

347    For more than twenty-two (22) months, the collective oppression, and assaults on PLAINTIFF'
348    human rights, causing PLAINTIFF to remain incarcerated indefinitely is ample reason for
349    PLAINTIFF to require an ARTICLE III VENUE. It is believed that Article III judicial power
350    imposes self-restraint on judges; and only judges appointed to Article III courts may exercise
351    the judicial power of the United States of America found in Article III, Section 2, judicial
352    power imposes restraints on the judges that have it and serves as greater protection from
353    judicial abuse.
354
355    All justices appointed to the Supreme Court of the United States are genuine Article III judges,
356    and the Aborigine rights of PLAINTIFF, are established under Article III jurisdiction, therefore
357    the demand for proper jurisdiction must be met in an Article III Court.
358
359    Congress has provided that territorial Title 28 U.S.C. judges be appointed to the United States
360    district court (legislative) for the district of Hawaii and are to be appointed to an Article III
361    court. *The district judges for the district of Hawaii are specifically to be appointed by the*
362    *President pursuant to sections 133 and 134 of title 28, United States Code, as officers of the*
363    *United States, but not as judges of an Article III court*. These two sections are also to be used
364    in appointing any of seven judges of the Puerto Rico district should a vacancy occur there. It
365    can be deduced that appointment pursuant to § 133 and 134 of Title 28, will always produce
366    territorial judges.
367
368    The Hawaii judicial district established in § 91 of the Judicial Code of 1948 was a territorial
369    court. The United States District Court of Puerto Rico is not a true United States court
370    established under Article III of the Constitution to administer the judicial power of the United
371    States, *Balzac v. Porto Rico, 258 U.S. 298, 312 (1922)*. In *Balzac*, Chief Justice William
372    Howard Taft stated that United States District Court for *Arecibo*, Porto Rico, as Puerto Rico
373    was known then, "created by virtue of the sovereign congressional faculty, granted under
374    Article IV, § 3, of that instrument, of making all needful rules and regulations respecting the
375    territory belonging to the United States."
376
377    Puerto Rico is the Commonwealth of Puerto Rico and it has not been incorporated into the
378    United States though its inhabitants are United States citizens. The inclusion of Puerto Rico in

379    Chapter 5 as § 119 does not make the district court for Puerto Rico an Article III court, because
380    Puerto Rico has not been incorporated into the Union. Puerto Rico fits comfortably among the
381    names of the 50 states because the geographical areas are mini federal territories or federal
382    enclaves and the same applies to the territory of the United States Virgin Islands, the territory
383    and location of DEFENDANT VIUS, DEFENDANT USVIPD ET AL.
384
385    Only Hawaii has an Article III district court, and that court cannot function as one, because no
386    ARTICLE III judges are appointed to that court; no other state has an Article III court. The
387    federal district courts of the United States Virgin Islands fall squarely within the mold of the
388    federal courts of the 50 states that have no Article III district courts where matters of
389    constitutional claims must be addressed. The use of the term, "district courts for the United
390    States" refers to Article III courts. There are no more than two "district courts for the United
391    States." There is no doubt that the district court for Hawaii is an Article III court—that's one.
392    The § 88 court for the District of Columbia is another.
393
394    The Historical and Revision Notes to that section make it clear that the District of Columbia
395    district court is a constitutional court established and ordained under Article III. The existence
396    of at least two "district courts for the United States" permits the general usage of language that
397    refers to the "district courts for the United States" as Article III courts.
398
399    The United States Supreme Court in two cases: Balzac v. Porto Rico, 258 U.S. 298 (1921) and
400    Mookini v. United States, 303 U.S. 201 (1938) made it clear that a ***"district court for the***
401    ***United States" described a court created under Article III*** and a ***"United States district court"***
402    ***described a territorial court***. The former identified a constitutional court of the United States
403    exercising the judicial power of the United States and the latter merely identified a court for a
404    district of the government of the United States.
405
406    The United States district courts are territorial and without judicial constitutional power. This
407    has been so since the Judiciary Act of 1789.  As such, the United States District Court for the
408    U.S. Virgin Islands is an inferior jurisdiction as it lacks the jurisdiction to properly address
409    PLAINTIFF's claim and demand is made for an Article III Judge in Article III venue in the
410    District Court For The United States of America, District of Columbia [Washington, D.C.].

411　　Relief may be awarded pursuant to Law of nations and this Court has venue of this action
412　　because the subject matter claims of (A) environmental deprivations of human rights, (B)
413　　particularly vulnerable racial communities and (C) procedural environmental rights violations,
414　　and (D) plaintiff's foreign aborigine status claims falls within the venue of the District Court
415　　for the United States of America, District of Columbia [Washington, D.C.] under Jus Cogens,
416　　Alien Tort Statute. G.A. Res 49/146, UN. Doc. No. A/RES/49/146 (Feb. 7, 1995) (reiterating
417　　that racism is one of the world's worst problems); U.N. Econ. & Soc. Council, Comm. on
418　　Econ., Soc., and Cultural Rights, *General Comment No. 20*, ¶ 2, U.N. Doc. E/C.12/GC/20 (July
419　　2, 2009) ("Non-discrimination and equality are fundamental components of international
420　　human rights law . . . ."); Declaration on Race and Racial Prejudice, U.N. Educational,
421　　Scientific and Cultural Organization (UNESCO), 20th Sess., gen. conf., U.N. Doc
422　　E/CN.4/Sub.2/1982/2/Add.1, annex V (Oct. 17, 1982) [hereinafter UNESCO Declaration on
423　　Race]; Int'l Law Comm'n, *Fragmentation of International Law: Difficulties Arising from the*
424　　*Diversification and Expansion of International Law*, *33, U.N. Doc. A/CN.4/L.702 (July 18,
425　　2006); Juridical Condition and Rights of the Undocumented Migrants, Advisory Opinion OC-
426　　18/03, Inter-Am. Ct. H.R. (ser. A) No. 18, ¶ 1 (Sep. 27, 2003) (Pesantes, J., concurring)
427　　("[E]quality and nondiscrimination are rights that form a platform on which others are
428　　erected").

429
430　　**Standard of Jurisdictional and International Norms**

431
432　　**U.N. Human Rights and Environment Report**, *supra* note 2, ¶ 175 (citing R.G. Ramcharan,
433　　The Right to Life 310–11 (1983)) (stating that criminal and civil international law liability may
434　　arise from environmental harm that threatens the right to life); Collins, *supra* note 125, at 129
435　　(suggesting environmental deprivations of rights have become customary international law
436　　because of recognition of this concept by international, regional, and domestic courts). Amici
437　　in *Flores* argued that environmental deprivations of rights violate customary international law,
438　　but their assertions are unlikely to be persuasive given *Flores*' sound rejection of their
439　　authority. Flores v. S. Peru Copper Corp., 414 F.3d 233, 265 (2d Cir. 2003) (citing The Paquete
440　　Habana, 175 U.S. 677, 700 (1900)). *Compare* Collins, *supra* note 125, at 129 (suggesting,
441　　without expressly stating, that environmental deprivations of rights are censured under
442　　customary international law) *with* Cohan, *supra* note 131, at 154 (stating that there is "little
443　　doubt" that indigenous peoples' environmental rights are protected under customary

444    international law). *See* Sarah Krakoff, *Tribal Sovereignty and Environmental Justice*, *in* Justice
445    and Natural Resources: Concepts, Strategies, and Applications 161, 167 (Kathryn M. Mutz et
446    al. eds., 2002) (noting the similarities between African American and Native American
447    struggles for environmental justice); Kathryn M. Mutz, *Mineral Development: Protecting the*
448    *Land and Communities*, *in* Justice.
449

450    The **Stockholm Declaration**, discussed *supra* in Part III.A, speaks to the widespread
451    acceptance of the prohibition on environmental racism. It impliedly prohibits environmental
452    racism by recognizing the fundamental right to equality in an environment that permits a life
453    of dignity and wellbeing.  Stockholm Declaration, *supra* note 57, at 4 at princ. 1. The United
454    Nations acknowledges that "Principle 1 of the Stockholm Declaration established a foundation
455    for linking human rights and environmental protection." Joint United Nations Environmental
456    Programme-Office of the High Commissioner of Human Rights Expert Seminar on Human
457    Rights and the Environment, Geneva, Switz., Jan. 14–16, 2002, Human Rights and
458    Environment Issues in Multilateral Treaties Adopted between 1991 and 2001 (prepared by
459    Dinah Shelton), @ ohchr.org/english/issues/environment/environ/bp1.htm; accord U.N.
460    Human Rights and Environment Report, supra note 2, ¶¶ 32, 50…. The 1992 Rio Declaration,
461    issued 20 years after the Stockholm Declaration, reaffirms the international community's
462    commitment to these principles. *See* Rio Declaration, *supra* note 53,
463

464    The **African Charter and the San Salvador Protocol** provide the same principle on a
465    regional level within Africa and the Americas, respectively, by recognizing the right to
466    environment alongside the obligation of non-discrimination. Together, these concepts prohibit
467    environmental deprivations of rights. African Charter, *supra* note 81, art. 2 (non-
468    discrimination), art. 21 (right to environment); Organization of American States, Additional
469    Protocol to the American Convention on Human Rights in the Area of Economic, Social and
470    Cultural Rights art. 3 (obligation of non-discrimination), art. 11 (right to environment), Nov.
471    17, 1988, O.A.S.T.S. No. 69 (entered into force Nov. 16, 1999) [hereinafter San Salvador
472    Protocol]. The Restatement recognizes the existence of regional customary international law.
473    Restatement (Third) of Foreign Relations Law of the United States § 102 cmt. e (1987).
474

475    The **Apartheid Convention**'s definition of "the crime of apartheid" includes any measure
476    designed to divide the population along racial lines, including the expropriation of property

477    and labor exploitation of a racial group. Both the Apartheid and Genocide Conventions prohibit
478    the deliberate imposition on a racial group of living conditions calculated to cause its physical
479    destruction. Such conditions would surely entail violations of social and economic rights, for
480    example, the rights to life, health, housing, or food. By prohibiting the larger wrong, therefore,
481    the international community also sought to prohibit the lesser wrongs included therein. The
482    Conventions thus seek to prevent environmental deprivations of rights, especially the rights to
483    life, health, and property. Apartheid Convention, *supra* note 77, art. II(d) (expropriation of
484    property), art. II (e) (labor exploitation). The Apartheid Convention limits its definition of
485    group solely to racial groups, while the Genocide Convention contains a slightly broader
486    definition. Apartheid Convention, *supra* note 77, art. II(b); Genocide Convention, *supra* note
487    80, art. II(c) (defining "group" as shared national, ethnic, racial or religious origin). For a
488    discussion of the intent requirements of the Apartheid and Genocide Conventions, see *supra*
489    note 94. Apartheid and Genocide Conventions, establishes that discriminatory expropriation
490    of, or interference with, property is a form of environmental racism.
491
492    **International Convention on the Elimination of All Forms of Racial Discrimination**
493    (ICERD) and the International Convention on the Suppression and Punishment of the Crime
494    of Apartheid (Apartheid Convention). Stephens et al., *supra* note 9, at 203. These agreements
495    are relevant to proving that racial non-discrimination is a norm of customary international law;
496    however, as the Restatement cautions, it is only systematic racial discrimination, practiced by
497    the state as a matter of state policy, that violates customary international law. Restatement
498    (Third) of Foreign Relations Law of the United States § 702 cmt. i (1987); *see supra* notes 69–
499    70 and accompanying text. International Convention on the Elimination of All Forms of Racial
500    Discrimination, *opened for signature* Dec. 21, 1965, S. Exec. Doc. C, 95-2 (1978), 660
501    U.N.T.S. 195 (entered into force Jan. 4, 1969) [hereinafter ICERD]; *see* Kevin Boyle &
502    Anneliese Baldaccini, *A Critical Evaluation of International Human Rights Approaches to*
503    *Racism, in* Discrimination and Human Rights. Racism 135, 149 (Sandra Fredman ed., 2001)
504    (noting that ICERD was the most widely ratified international human rights treaty until 1993,
505    when the Convention on the Rights of the Child surpassed it). Notably, the ICERD imposes
506    duties on States Parties that are "more than merely promotional," Schwelb, *supra* note 1, at
507    1016, which adds to its authority. *See* Jeffrey M. Blum & Ralph G. Steinhardt, *Federal*
508    *Jurisdiction Over International Human Rights Claims*, 22 Harv. Int'l. L.J. 53, 89 (1981)

509   (noting that the most authoritative international norms are those that create immediate legal
510   obligations, as compared to non-obligatory norms that merely encourage appropriate action).

511
512   **Restatement (Third) of Foreign Relations Law of the United States** §§ 102(3), 102 cmt. i,
513   Introductory Note to Part VII (1987); *see* Stephens et al., *supra* note 9, at 67 (noting that widely
514   ratified international agreements, even those that are non-binding, may reflect a norm of
515   customary international law); Blum & Steinhardt, *supra* note 76, at 89 ("Obligatory norms
516   typically are expressed in numerous international instruments, including those that are most
517   authoritative in that they reflect a broad consensus of states."). This may be true even when
518   agreements do not purport to codify customary international law. Restatement (Third) of
519   Foreign Relations Law of the United States § 102 reporter's note 5 (1987).

520
521   The **SOSA NORM for Environmental Racism in International Law**; environmental
522   deprivations of rights are censured in both the Inter-American and African regional human
523   rights systems and decried and defined most strongly by the Committee *on* Economic, *Social*
524   *and* Cultural Rights CESCR. Protection against environmental racism targeted at indigenous
525   peoples and their property rights is strong across the world, as evidenced by Inter-American,
526   HRC, and CERD jurisprudence as well as Australia's Mabo decision and its numerous
527   successors in other countries. Similar protections have been extended to prevent discrimination
528   in procedural environmental rights, with the Inter-American system, the HRC, and Botswana
529   as examples. Judicial decisions evidence an especially strong protection of the right to property
530   and procedural rights. The number of decisions suggests that the norm prohibiting
531   environmental racism is widely accepted, as *Sosa* requires. By condemning concrete instances
532   of environmental racism, these decisions suggest that the norm has definite content, thereby
533   meeting *Sosa*'s first prong.

534
535                                **III. PARTIES**

536
537   **PLAINTIFF**, Makurija Sakatu (the "PLAINTIFF"), is a natural indigenous inhabitant of the
538   Virgin Islands territory and acting tribal authority for the Akawjo Typyne Kupa tribe of the
539   Maipuri Arauan nation and descendant of the natural inhabitant Arawak people, descendant
540   and heir of the original aborigine described throughout the Caribbean including the Virgin
541   Islands. The Akawjo Typyne Kupa tribe is one of more than five thousand tribes registered

542   with the Maipuri Arauan Nation, and one of forty plus Maipuri Arauan Nation tribes living in
543   the territories controlled by DEFENDANTS VIUS and DOI.
544
545   PLAINTIFF of the Akawjo Typyne Kupa tribe is an American aborigine tribe, band, clan,
546   family and entity recorded with the U.S. State Department, Department of Commerce and the
547   U.S. Census Bureau and in 2015 PLAINTIFF became one of many beneficiaries of a U.S.
548   Commerce Department' American aborigine identity correction, which was ordered by United
549   States Inspector General Todd Zinser, February 2015, and at all relevant times and up to the
550   present, PLAINTIFF has continuously maintained tribal relations throughout the Virgin
551   Islands territories and the Caribbean, whose entitlement to the territories remains intact and
552   has never been terminated or abandoned.
553
554   PLAINTIFF declares that the negligence of DEFENDANTS DOI and HAALAND, led to
555   governmentwide actions of "Official Oppression", where PLAINTIFF is and was
556   misidentified, misclassified as someone PLAINTIFF is not, through forced assimilation into
557   accordance with policies created and used by DEFENDANTS DOI, and PLAINTIFF declares
558   that those same policies caused or encouraged the policies used by DEFENDANTS USVIPD,
559   VIUS, BRYAN, CANTON, TEJO, GEORGE, DOWE, MARTINEZ, ET AL  and caused the
560   pain, suffering and aggravated kidnapping of PLAINTIFF by DEFENDANTS ET AL,.
561
562
563   **DEFENDANT DEPARTMENT OF INTERIOR** (DOI) is an agency of the United States
564   government, it protects and manages the U.S. natural resources and cultural heritage; provides
565   scientific and other information about those resources; and honors its trust responsibilities or
566   special commitments to American Indians, Alaska Natives, and affiliated Island Communities,
567   including Arawak.
568
569   **DEFENDANT HAALAND** is the current U.S. Secretary for the U.S. Department of Interior,
570   where she not only manages Indian affairs, but she controls how the inhabitants of the Virgin
571   Islands are classified, viewed, and treated. In the capacity as United States Interior Secretary,
572   DEFENDANT HAALAND has blatantly ignored the American Arawak inhabitants of the
573   Virgin Islands territory, perpetuating the diminished rights and freedoms of PLAINTIFF'

574    indigenous rights, and even after PLAINTIFF sent numerous communications requesting
575    clarification concerning indigenous rights of Arawak in the territory under the policies of
576    DEFENDANT DOI and administered by DEFENDANT DOI employee, DEFENDANT
577    HAALAND, with no communications coming from neither DEFENDANT DOI nor
578    DEFENDANT HAALAND.
579
580    **DEFENDANT VIUS** is the corporate insured institution representing and housing the
581    commercial government administration, fulfilling the agendas of governing the people and
582    lands of the United States controlled islands in the Virgin Islands territory, is a municipal
583    corporation organized and existing under the laws of the United States and organized under
584    the U.S. Congress approved United States Virgin Islands Organic Act (USVI Constitution).
585    DEFENDANT VIUS currently claims title to and jurisdiction over occupants, including the
586    natural inhabitant indigenous Arawak peoples of the subject lands.
587
588    DEFENDANT DOI and VIUS possess no deed, title or bill of sale showing valid acquisition
589    of the indigenous Arawak people inhabiting the territory at the time of purchase of the so-
590    called Virgin Islands. PLAINTIFF demands proof showing that PLAINTIFF has lost title and
591    rights to self-determination and Proof that DEFENDANTS VIUS and DOI possess trustee
592    powers in relation to PLAINTIFF and PLAINTIFF' tribe.
593
594    DEFENDANTS ET AL are sued both officially and individually and pursuant to Rules 23(a)
595    and (b)(1) of the Federal Rules of Civil Procedure, as representatives of the defendant class,
596    composed of all persons or entities that operate as employees and party to any offense against
597    PLAINTIFF in this matter as of the filing of this complaint. The number of members of the
598    defendant class is approximately 200 or more persons and is thus so numerous that joinder of
599    all members is impracticable. There are questions of law and fact common to the members of
600    the defendant class, and the defenses of the named representatives are typical of the defenses
601    of the class. The representative defendants will fairly and adequately represent the interests of
602    the defendant class.
603
604    The prosecution of separate actions against individual members of the defendant class would
605    create a risk of adjudications with respect to individual members of the class which would as

606    a practical matter, be dispositive of the interests of the other proposed class members or
607    substantially impair or impede their ability to protect their interests.
608

609    **DEFENDANT BRYAN** is the governor and chief authority for the DEFENDANT VIUS,
610    which includes DEFENDANTS CHARLES, DOWE, FREEMAN, LO BLACK, WALTERS,
611    HARRIGAN, MARTINEZ, USVIPD, CANTON and TEJO
612

613    **DEFENDANT DENISE GEORGE** (DEFENDANT GEORGE) is the former Attorney
614    General for DEFENDANT VIUS and DOI. PLAINTIFF sustained a personal attack from
615    DEFENDANT GEORG until she was removed after PLAINTIFF filed official complaints with
616    the Department of Justice, Congresswoman Maxine Waters and Senator Elizabeth Warren,
617    where PLAINTIFF requested assistance and help due to being kidnapped (No Warrant) and
618    then being prosecuted maliciously by DEFENDANT GEORGE until DEFENDANT
619    GEORGE was removed from office by DEFENDANT BRYAN for being ineffective as an
620    Attorney General, as stated by DEFENDANT BRYAN on local TV news.
621

622    **DEFENDANT RAY MARTINEZ** (DEFENDANT MARTINEZ) at all times relevant to this
623    complaint was supervisor of DEFENDANTS HARRIGAN, LOBLACK, WALTERS and
624    FREEMAN, covered by official constitutional Oath related Insurance Bond, attached to rank
625    of employment as a senior ranked employee operating under the policies, guidance and
626    direction of DEFENDANTS VIUS, USVIPD and DEFENDANT MARTINEZ.
627    PLAINTIFF Makurija Sakatu declares that on August 6, 2021, at approximately 9:30 am,
628    PLAINTIFF was arrested without Warrant or Court Order, on hearsay allegations with no
629    evidence of a crime by DEFENDANTS FREEMAN and LOBLACK. According to court
630    testimony DEFENDANT HARRIGAN reviewed and approved fraudulent statements written
631    incovin by DEFENDANTS LOBLACK, FREEMAN and DEFENDANT WALTERS, who
632    also arrived at PLAINTIFF' home and assisted in the committed offense of aggravated
633    kidnapping and malicious imprisonment of PLAINTIFF, causing a thirteen (13) month
634    physical imprisonment, kidnapping and physical and emotional injury of PLAINTIFF,
635    suffering a nineteen (19) month illegal detainment and electronic monitoring further violating
636    PLAINTIFF' right to privacy, causing similarities as in "**Trezevant v. City of Tampa, 746**
637    **F.2d 815 (11th Cir. 1984)", where PLAINTIFF shows PLAINTIFF was similarly violated,**

638  **see EXHIBIT B., and in this PLAINTIFF is asking for Five hundred and fifty seven**

639  **million, three hundred eighty six thousand dollars ($557, 386,000) for damages and**

640  **violations related to claims stated herein.**

641

642  PLAINTIFF declares that citizens of the Maipuri Arauan nation are being discriminated against

643  systematically by the DEFENDANT USVIPD under supervision and direction of DEFENDANT

644  MARTINEZ in violation of International Labor Organization Convention number 169; Maipuri citizens

645  are barred from using their tribal ID information to visit fellow incarcerated citizens and family due to

646  discriminatory policies permitted by DEFENDANT USVIPD and authorized by DEFENDANT

647  MARTINEZ. PLAINTIFF is assisting numerous tribal citizens with official complaints to file,

648  involving official oppression, false arrest, and intimidations by police utilizing Color of law.

649  These abuses are currently enacted by members of DEFENDANT USVIPD under the

650  command of DEFENDANT MARTINEZ.

651

652  **DEFENDANT TAMIA FREEMAN** (DEFENDANT FREEMAN) at all times relevant to this

653  complaint was an employee operating under the policies, guidance and direction of

654  DEFENDANT VIUS, DEFENDANT USVIPD and DEFENDANT MARTINEZ. On August

655  6, 2021, at approximately 9:30 am, PLAINTIFF Makurija Sakatu was arrested without Warrant

656  or Court Order, on hearsay allegations with no evidence of a crime. Armed with a handgun

657  DEFENDANT FREEMAN committed the offense of aggravated kidnapping and malicious

658  imprisonment of PLAINTIFF, causing a thirteen (13) month physical imprisonment,

659  kidnapping and physical and emotional injury of PLAINTIFF, suffering a nineteen (19) month

660  illegal detainment and electronic monitoring further violating PLAINTIFF' right to privacy,

661  causing similarities as in **"Trezevant v. City of Tampa, 746 F.2d 815 (11th Cir. 1984)"**,

662  **where PLAINTIFF shows he was similarly violated, see EXHIBIT B.**

663

664  **DEFENDANT YORDANA LO BLACK** (DEFENDANT LO BLACK) at all times relevant

665  to this complaint was an employee operating under the policies, guidance and direction of

666  DEFENDANT VIUS, DEFENDANT USVIPD and DEFENDANT MARTINEZ. On August

667  6, 2021, at approximately 9:30 am, PLAINTIFF Makurija Sakatu was arrested without Warrant

668  or Court Order, on hearsay allegations with no evidence of a crime. Armed with a handgun

669  DEFENDANT LOBLACK committed the offense of aggravated kidnapping and malicious

670  imprisonment of PLAINTIFF, causing a thirteen (13) month physical imprisonment,

671    kidnapping and physical and emotional injury of PLAINTIFF, suffering a nineteen (19) month
672    illegal detainment and electronic monitoring further violating PLAINTIFF' right to privacy,
673    causing similarities as in "**Trezevant v. City of Tampa, 746 F.2d 815 (11th Cir. 1984)**",
674    **where PLAINTIFF shows he was similarly violated, see EXHIBIT B.**
675
676    **DEFENDANT DENEISHA WALTERS** (DEFENDANT WALTERS), at all times relevant
677    to this complaint was an employee operating under the policies, guidance, and direction of
678    DEFENDANT VIUS, DEFENDANT USVIPD and DEFENDANT MARTINEZ. On August
679    6, 2021, at approximately 9:30 am, PLAINTIFF Makurija Sakatu was arrested without Warrant
680    or Court Order, on hearsay allegations with no evidence of a crime. Armed with a handgun
681    DEFENDANT WALTERS committed the offense of aggravated kidnapping and malicious
682    imprisonment of PLAINTIFF, causing a thirteen (13) month physical imprisonment,
683    kidnapping and physical and emotional injury of PLAINTIFF, suffering nineteen (19) month
684    illegal detainment and electronic monitoring further violating PLAINTIFF' right to privacy,
685    causing similarities as in "**Trezevant v. City of Tampa, 746 F.2d 815 (11th Cir. 1984)**",
686    **where PLAINTIFF shows he was similarly violated, see EXHIBIT B.**
687
688    **DEFENDANT MELANIE HARRIGAN** (DEFENDANT HARRIGAN) at all times relevant
689    to this complaint was supervisor of DEFENDANTS LOBLACK, WALTER and FREEMAN,
690    covered by official constitutional Oath related Insurance Bond, attached to rank of employment
691    as a senior ranked employee operating under the policies, guidance and direction of
692    DEFENDANT VIUS, DEFENDANT USVIPD and DEFENDANT MARTINEZ. On August
693    6, 2021, at approximately 9:30 am, PLAINTIFF Makurija Sakatu was arrested without Warrant
694    or Court Order, on hearsay allegations with no evidence of a crime by DEFENDANTS
695    FREEMAN and LOBLACK. According to court testimony DEFENDANT HARRIGAN
696    reviewed and approved fraudulent statements written incovin by DEFENDANTS LOBLACK,
697    FREEMAN and on scene DEFENDANT WALTERS who also later arrived at PLAINTIFF'
698    home and assisted in the committed offense of aggravated kidnapping and malicious
699    imprisonment of PLAINTIFF, causing a thirteen (13) month physical imprisonment,
700    kidnapping and physical and emotional injury of PLAINTIFF, suffering nineteen (19) month
701    illegal detainment and electronic monitoring further violating PLAINTIFF' right to privacy,

702    causing similarities as in "**Trezevant v. City of Tampa, 746 F.2d 815 (11th Cir. 1984)**",
703    where PLAINTIFF shows PLAINTIFF was similarly violated, see EXHIBIT B.

704

705    **DEFENDANT SEGRID TEJO** (DEFENDANT TEJO) held PLAINTIFF incarcerated for
706    nineteen (19) months as she continually after numerous request for evidence, DEFENDANT
707    TEJO waited until PLAINTIFF threatened to file suit, then DEFENDANT TEJO allowed the
708    matter to be Dismissed for a Lack of Evidence, and DEFENDANT TEJO has ordered
709    DEFENDANT USVIPD to keep possession of PLAINTIFF' personal property.

710

711    PLAINTIFF gained access to the complaint written by DEFENDANTS FREEMAN and LO
712    BLACK and approved by their supervisors DEFENDANT DENEISHA WALTERS
713    (DEFENDANT WALTERS) and DEFENDANT MELANIE HARRIGAN (DEFENDANT
714    HARRIGAN) nine months later and with assistance of PLAINTIFF'S tribal representative,
715    Tushkahumoc Xelup, and instead of dismissing the Matter, DEFENDANT SIGRID TEJO
716    (DEFENDANT TEJO) allowed DEFENDANTS FREEMAN and LO BLACK to change their
717    Affidavit of Complaint.

718

719    Upon PLAINTIFF' reviewing the arresting instruments PLAINTIFF became aware that the
720    arresting information was in error. For the first time after nine (9) months PLAINTIFF was
721    shown the documents which revealed FALSE CHARGES against PLAINTIFF; PLAINTIFF
722    was charged twice for the same offenses. These FALSE CHARGES caused PLAINTIFF'
723    BOND to be increased and violated PLAINTIFF' DUE PROCESS, effectively committing an
724    offense of FALSE ARREST. *In order to effect a valid arrest, the charging instrument must be*
725    *without errors* and DEFENDANTS BLACK, FREEMAN AND WALTERS admitted to filing
726    false information. DEFENDANTS FREEMAN and BLACK were permitted to change their
727    statements nine (9) months after the initial false information was placed into the police records.

728

729    The false and fraudulent information filed by DEFENDANTS FREEMAN and BLACK and
730    approved by DEFENDANT WALTERS has caused a tort of pain, suffering, deprivation,
731    physical injury and destruction to PLAINTIFF' reputation, beyond causing PLAINTIFF to
732    have a much higher Bond, and creating hardship and delay in PLAINTIFF gaining proper Bond
733    to be released, causing unnecessary and prolonged imprisonment.

734

735    **DEFENDANT A. CANTON** at all times relevant to this case has functioned as an employee

736    of the DEFENDANT VIUS, and in that capacity DEFENDANT CANTON on numerous

737    occasions gave orders to various agencies controlled by DEFENDANTS BRYAN and VIUS

738    to not accept official tribal communications, documents and identification information, citing

739    PLAINTIFF' documents and tribal ID were fraudulent documents and were not to be accepted

740    as valid.

741

742    **DEFENDANT USVIPD** at all times is responsible for its employees and is liable for providing

743    policy for arrest guidelines and is responsible for all breakdowns in communication of orders

744    and arrest procedures, and such policies are ignored by DEFENDANT USVIPD EY AL

745    causing tremendous damage against PLAINTIFF.

746

747    **DEFENDANT TAMARA CHARLES** (DEFENDANT CHARLES) at all time relevant to

748    this matter was and is employed COURT CLERK for the DEFENDANT VIUS. PLAINTIFF

749    was denied right to file information into PLAINTIFF court records which were house by

750    DEFENDANT CHARLES in a previous and Dismissed issue. DEFENDANT CHARLES and

751    TEJO barred PLAINTIFF drim entering the clerk's office and PLAINTIFF was denied access

752    to all government buildings by DEFENDANTS TEJO and CHARLES

753

754    **DEFENDANT CONNAL RIVIERA ALFRED** manager of **FIRST BANK**, where on January 13th,

755    2023, PLAINTIFF went into the Firstbank located at VIII, Mandela Circle, Estate Thomas (Havensight)

756    to open a bank account. While inside the bank, PLAINTIFF was assaulted by an employee of the bank.

757    PLAINTIFF called the police to make a report. Once the police officer arrived, PLAINTIFF provided

758    his tribe' national ID card, which is permitted under the United States "Tribal Labor Sovereignty Act"

759    of 2015. The officer accepted the identification and took a report. The officer instructed PLAINTIFF

760    to go to the police station to get a copy of the report. When PLAINTIFF went to the Police station to

761    secure copy of PLAINTIFF' filed complaint, he was denied copy of the report. PLAINTIFF was told

762    by DEFENDANT USVIPD representative that his nation ID was not valid and refused to help.

763

764    **DEFENDANT CAMITA DOWE** manager for the **USVI BUREAU of MOTOR VEHICLES**.

765    PLAINTIFF states that on December 7, 2022, PLAINTIFF went to the USVI Bureau of Motor Vehicles

766    to register a recently purchased truck to travel back and forth to work. During this period PLAINTIFF

767    was released on bond related to a criminal case, which has now been recently dismissed. PLAINTIFF

768    provided both Title and Bill of Sale to DEFENDANT DOWE. DEFENDANT accepted PLAINTIFF'

769    documents, including the Title. DEFENDANT DOWE then contacted DEFENDANT GEORGE and

770    DEFENDANT CANTON, who ordered not to register the vehicle and DEFENDANT DOWE says she

771    could not register the vehicle, nor could she return the Title unless PLAINTIFF provided a USVI

772    identification.

773

774    DEFENDANT DOWE refused to accept PLAINTIFF' tribal ID and DEFENDANT DOWE took

775    PLAINTIFF' property and refused to return documents to PLAINTIFF; PLAINTIFF was forced to

776    secure vehicle plates and registration thru PLAINTIFF' national tribal government.

777

778    **DEFENDANT ARCHIE NAHIGIAN** (DEFENDANT NAHIGIAN) owner of the **DAILY**

779    **NEWSPAPER** located at 9155 Estate Thomas, St Thomas, Virgin Islands. PLAINTIFF states that

780    DEFENDANT ARCHIE NAHIGIAN (DEFENDANT AN) injured PLAINTIFF' reputation and

781    employment opportunities, and misclassified PLAINTIFF as a member of terrorist institutions, due to

782    the false and unsubstantiated information printed in DEFENDANT AN' news reports published by

783    popular media outlet called the DAILY NEWS found at **EXHIBIT C**, which is circulated throughout

784    the Caribbean communities, reaching millions of readers. PLAINTIFF has received communications

785    concerning the false news information from associates throughout the territory, where PLAINTIFF is

786    recognized as a Congress member the Western Hemisphere Indigenous Peoples Alliance (WHIPA) and

787    Maipuri Arauan Nation.

788

789    **Points and Authority**

790

791    PLAINTIFF herein has been made subject to DEFENDANTS ET AL, yet PLAINTIFF has

792    never willingly or knowingly filed any known agreement to participate in such inhumane

793    subjugation under DEFENDANTS ET AL and now demands proof that DEFENDANTS ET

794    AL has the authority to demand or force under any policy the reclassification of PLAINTIFF,

795    a declared natural inhabitant of the Virgin Islands territory, against PLAINTIFF' will and

796    without PLAINTIFF' consent.

797

798    Plaintiff has brought this action against the named DEFENDANTS ET AL, only because all

799    other avenues of redress have been closed until this filing; PLAINTIFF again cites that

800    DEFENDANTS ET AL  have perpetuated a system that discriminates, on grounds of race,

801      against PLAINTIFF by denying access to cultural identity, cultural habitat, cultural rights,
802      environmental information, environmental decision making, and legal redress for
803      environmental wrongs, cultural deprivations, involuntary servitude, apartheid and genocide
804      against Arawak people.

805

806                       **REMEDY**
807

808      DEFENDANTS ET AL must affirmatively seek diverse initiatives extending strong protections
809      against environmental racism to PLAINTIFF's rights, recognizing the vulnerability of
810      PLAINTIFF's specific racial groups to environmental and human racism and discrimination.

811

812      Declaratory Judgment

813          a) PLAINTIFF requests declaratory judgment that the defendant's actions violated his
814              rights to be Free from unlawful arrest and seizure as guaranteed by the Fourth
815              Amendment to the United States Constitution.
816          b) That DEFENDANTS ET AL actions violated PLAINTIFF's rights, privileges and
817              immunities afforded him by the United States and DEFENDANTS DOI and VIUS, as
818              attested to by the PLAINTIFF' documents.
819          c) PLAINTIFF seeks a DECLARATORY JUDGEMENT against DEFENDANT DOI ET
820              AL and VIUS ET AL to cease and desist all actions related to enforcing colonial and
821              State identity upon PLAINTIFF, who is in fact a member of the indigenous Arawak
822              community.

823

824      Injunctive Relief

825          a) PLAINTIFF demands that the DEFENDANTS ET AL herein be enjoined from any
826              forms of discrimination towards PLAINTIFF. PLAINTIFF is currently temporarily
827              located at PLAINTIFF' Chicago address due to threats against PLAINTIFF' life.
828              Injunction requested against DEFENDANT'S ET AL actions of Official Oppression of
829              PLAINTIFF and all Arawak inhabitants of the subject territories.

830

831      Compensatory Damages

832  Compensatory Damages $475,000 for lost wages and employment which is still occurring due to
833  DEFENDANT USVIPD refusal to release PLAINTIFF' phone which contains PLAINTIFF' work
834  related contacts and contract relations.
835
836
837  Monetary Damages
838  PLAINTIFF shows PLAINTIFF was similarly violated, by DEFENDANTS ET AL, see EXHIBIT
839  B., and in this PLAINTIFF is asking for Five hundred and fifty-seven million, three hundred eighty-
840  six thousand dollars ($557, 386,000) for False Arrest.
841

842  a)  That DEFENDANTS ET AL pay monetary damages in accordance with standard
843      compensation allowed for violations committed by DEFENDANTS ET AL as herein
844      stated, and in addition to compensatory damages of $557,386,000 requested in
845      accordance with Trezvant v City of Tampa.
846

847  **Demand for Relief**
848
849  WHEREFORE, PLAINTIFF respectfully prays for an order:
850  1. Right to unencumbered use of ceremonial lands and the return of other vacant lands
851     subject to environmental decay and destruction.
852  2. Return of available lands to be reserved for future generations.
853  3. Compensated for taxes collected from PLAINTIFF.
854  4. Return of PLAINTIFF's principal villages, currently called Caneel Bay.
855  5. Ecological reparations for the environmental destruction to air, land and water ways of
856     PLAINTIFF's ancestral habitat.
857  6. Re-enfranchisement of rights and implicit governance of the repair and maintenance of
858     environmentally affected lands mentioned herein.
859  7. Obligate DEFENDANTS ET AL to develop and implement diverse policies which
860     considers and enforces the rights of the indigenous inhabitants.
861  8. Implement policies reflecting the human rights and environmental interests of
862     PLAINTIFF and PLAINTIFF's indigenous family, and hold DEFENDANTS ET AL
863     accountable for historic inequities in such decisions of deprivation against

864    PLAINTIFF's rights as mentioned above, providing environmental justice in the
865    right to participate as equal partners at every level of decision-making including
866    needs assessment, planning, implementation, enforcement and evaluation of toxic
867    ancestral lands inhabited by PLAINTIFF and PLAINTIFF's family members.

868  9. Declaring that the indigenous lands were acquired or transferred through illegal
869    acquisition violating PLAINTIFF' right to habitat in violation of the doctrines of
870    apartheid, and that any so-called taking or transferring of Ayai (Virgin Islands) territory
871    was illegal and the purchase of Arawak people was void *ab initio*;

872  10. Awarding PLAINTIFF damages, and interest thereon, as described above in the
873    complaint.

874  11. Requiring the Defendants et al to disgorge the benefits they have received from their
875    illegal purchases, sale, and possessions of the subject Arawak people, with interest.

876  12. Awarding such other and further relief, both special and general, at law or in equity,
877    as the Court may deem just and proper.

879    PLAINTIFF

881    Makurija Sakatu
882    Maipuri Arauan Nation

884  STATE OF NEW JERSEY}
885  COUNTY OF OCEAN COUNTY}

887    VERIFICATION

888    I, Makurija Sakatu, verify that I have developed and submitted the allegations contained in
889  this Verified Complaint, that I have personal knowledge of the facts, and that the facts stated in
890  the Verified Complaint are true, except those facts alleged upon information and belief, as to
891  those facts, I believe they are true. The foregoing instrument was acknowledged before me this
892  ___ day of June 2023, by Makurija Sakatu, who personally appeared before me and
893  acknowledged the above to be his free act and deed.

896    Notary Public

MATTHEW A. NANNIE
NOTARY PUBLIC, NEW JERSEY
MY COMMISSION EXPIRES OCTOBER 13, 2025

27